Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Michael Vanunu, Esq.
Joanna Rosenblatt, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,
GEICO Indemnity Company, GEICO General Insurance Company
and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and          Docket No.:_____ (      )
GEICO CASUALTY COMPANY,

                        Plaintiffs,

                                      **Plaintiff Demands a Trial by Jury**

      -against-

BHDS SUPPLY INC., DMYTRO PRASOL,
EXAMPLESUPPLY INC., DANYLO NESTEROV, and
JOHN DOE DEFENDANTS 1-10,

                        Defendants.
-----------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, hereby allege as follows:

## INTRODUCTION

    1.    GEICO brings this action to recover more than $525,000.00 that Defendants have

wrongfully obtained from GEICO by submitting and causing thousands of fraudulent no-fault

insurance charges to be submitted relating to medically unnecessary, illusory, and otherwise non-

reimbursable durable medical equipment ("DME") comprised of medically unnecessary Triad 3LT Infrared Heat Pad with Low Level Light Therapy devices ("Triad Devices"), Cold Compression Therapy Systems and attendant accessories ("CCTS"), osteogenesis stimulators, pneumatic compression devices ("PCDs"), and pulsed electromagnetic therapy devices ("PEMF Device") (collectively, the "Fraudulent Equipment") through two companies known as BHDS Supply Inc. ("BHDS Supply") and ExampleSupply Inc. ("Example Supply") (collectively, the "DME Providers"). The Fraudulent Equipment is alleged have been provided to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

2.     The DME Providers are New York corporations that are purportedly owned by Dmytro Prasol ("Prasol") and Danylo Nesterov ("Nesterov") (collectively, the "Paper Owner Defendants"). The Paper Owner Defendants, in conjunction with others not presently identifiable to GEICO, devised a scheme to obtain medically unnecessary prescriptions from healthcare providers working out of no-fault clinics in the New York metropolitan area (the "Referring Providers") through unlawful kickbacks and other financial incentives.

3.     Once the prescriptions were secured, Defendants then collectively billed GEICO alone more than $3.1 million, with both DME Providers making virtually identical fraudulent misrepresentations to GEICO concerning the types of Fraudulent Equipment allegedly provided to Insureds and the maximum reimbursement rates they were entitled to receive. As part of their scheme to wrongfully extract money from GEICO without detection, Defendants shifted the billing submitted to GEICO from BHDS Supply to Example Supply.

4.     GEICO seeks to terminate this fraudulent scheme and recover more than $536,000.00 that has been wrongfully obtained by the DME Providers, the Paper Owner

Defendants, and John Doe Defendants "1" – "10" (the "John Doe Defendants") (collectively, the "Defendants") since 2023 and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $2.1 million in pending no-fault insurance claims that have been submitted by or on behalf of the DME Providers since inception because:

(i)     Defendants billed GEICO for Fraudulent Equipment when they were not eligible to collect No-Fault Benefits because they failed to comply with local licensing requirements;

(ii)    Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was prescribed as a result of unlawful financial arrangements with others who are not presently identifiable;

(iii)   Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was alleged prescribed and provided pursuant to predetermined fraudulent protocols designed to exploit Insureds for financial gain, without regard for genuine patient care; and

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by Defendants fraudulently and grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment.

5.      The Defendants fall into the following categories:

(i)     The DME Providers are New York corporations that purport to purchase DME from wholesalers, purport to provide the Fraudulent Equipment to automobile accident victims, and bill New York automobile insurance companies, including GEICO, for Fraudulent Equipment;

(ii)    Defendant Prasol is listed on paper as the owner, operator, and controller of BHDS Supply when, as discussed below, Prasol works for one of the John Doe Defendants who secretly operated, managed, controlled and financially benefited from the DME Providers, and used BHDS Supply to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims;

(iii)   Defendant Nesterov is listed on paper as the owner, operator, and controller of Example Supply, when, as discussed below, Nesterov works for one of the John Doe Defendants who secretly controls and works for one of the John Doe Defendants who secretly operated, managed, controlled and financially benefited from the DME Providers, and used Example Supply to submit bills to GEICO and other New York automobile insurance

companies for Fraudulent Equipment purportedly provided to automobile accident victims; and

(iv)    The John Doe Defendants are citizens of New York and are presently not identifiable but are: (i) secretly controlling and profiting from the DME Providers; (ii) associated with the Referring Providers and various multi-disciplinary medical offices that purportedly treat high-volume of No-Fault insurance patients (the "Clinics"); (iii) are the sources of prescriptions to the DME Providers; and/or (iv) conspired with the Paper Owner Defendants to further the fraudulent schemes against GEICO and other automobile insurers.

6.    As discussed below, Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)    The bills for Fraudulent Equipment submitted by Defendants to GEICO fraudulently misrepresented that Defendants complied with all local licensing requirements when Defendants were never lawfully licensed to provide the Fraudulent Equipment by the New York City Department of Consumer and Worker Protection, as they failed to obtain all necessary licenses to operate lawfully in New York City;

(ii)    The Fraudulent Equipment provided – to the extent that any Fraudulent Equipment was provided – was medically unnecessary and based upon phony prescriptions obtained as a result of unlawful financial arrangements between Defendants and others who are not presently identifiable and, thus, not entitled for no-fault insurance reimbursement in the first instance;

(iii)    The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent provided – pursuant to predetermined fraudulent protocols created by Defendants and others not presently identifiable to GEICO to enrich themselves, rather than to treat or otherwise benefit the Insureds; and

(iv)    To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by Defendants to GEICO – and other New York automobile insurers – fraudulently and grossly inflated the permissible reimbursement rate that Defendants could have received for the Fraudulent Equipment.

7.    As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the DME Providers.

8.    The charts attached hereto as Exhibits "1" and "2", set forth a representative sample

of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to Defendants' fraudulent scheme through BHDS Supply and Example Supply.

9.      Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry has been ongoing for many years and began no later than December 2023. The fraudulent scheme has continued uninterrupted since that time.

10.     As a result of Defendants' fraudulent scheme, GEICO has incurred damages of more than $525,000.00.

## THE PARTIES

### I.    Plaintiffs

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are all Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.   Defendants

12.     John Doe Defendant "1" (hereinafter, the "Secret Owner") is a citizen of New York and is presently not identifiable but is secretly controlling and profiting from the DME Providers, and conspired with others, who are not presently identifiable, at various Clinics to obtain prescriptions purportedly issued by the Referring Providers that were used by the DME Providers to submit bills to GEICO, and other New York automobile insurers, seeking payment for the Fraudulent Equipment.

13.     Defendant Prasol resides in and is a citizen of New Jersey and is listed as the "paper" owner of BHDS Supply.

14.    Defendant BHDS Supply is a New York corporation with its principal place of business in Brooklyn, New York, specifically 1702 Avenue Z, Suite 102, Brooklyn, New York (the "Avenue Z Location"). BHDS Supply was incorporated on December 1, 2023 and is owned on paper and purportedly operated and controlled by Prasol. In actuality, Secret Owner operated, managed, controlled and financially benefited from BHDS Supply and, with the aid of Prasol, used BHDS Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

15.    Defendant Nesterov resides in and is a citizen of New Jersey and is listed as the "paper" owner of Example Supply.

16.    Defendant Example Supply is a New York corporation with its principal place of business at 4499 Bedford Avenue, Brooklyn, New York (the "Bedford Avenue Location"). Example Supply was incorporated on June 5, 2024, and is owned on paper and purportedly operated and controlled by Nesterov. In actuality, Secret Owner operated, managed, controlled and financially benefited from Example Supply and, with the aid of Nesterov, used Example Supply as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

17.    Upon information and belief, the John Doe Defendants reside in and are citizens of New York.  The John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of the DME Providers and the dispensing of the Fraudulent Equipment, engaging in illegal financial and kickback arrangements to obtain patient referrals for the DME Providers, and furthering the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

### JURISDICTION AND VENUE

18.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §

1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

19.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

20.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

21.    GEICO underwrites automobile insurance in the State of New York.

## I.    An Overview of the Pertinent Laws

### A.    Pertinent Laws Governing No-Fault Insurance Reimbursement

22.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

23.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

24.    In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME. See N.Y. Ins. Law § 5102(a).

25.    In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

26.    For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

27.    In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

28.    Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME.

29.    New York City's Administrative Code requires DME suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection ("DCWP") in order to lawfully provide DME to the disabled, which is defined as "a person who has a physical or medical impairment resulting

8

from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY § 2-271; NYC Admin. Code §20-425.

30.     It is unlawful for any DME supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  See NYC Admin. Code §20-426.

31.     A Dealer in Products License is obtained by filing a license application with the DCWP. The application requires that the applicant identify, among other pertinent information, the commercial address of where the DME supplier is physically operating from.

32.     The license application for a Dealer in Products License also requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation to the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

33.     New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

34.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

35.     Pursuant to a duly executed assignment, a healthcare provider may submit claims

directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

36.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

37.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

38.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME**

39.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not

lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

40.    DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, and whirlpool baths.

41.    To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York State Workers' Compensation Board instituted the New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("DME Fee Schedule"), which is reflected in 12 N.Y.C.R.R. 442.2.

42.    In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

43.    According to the DME Fee Schedule, certain pieces of DME have an established fee payable ("Fee Schedule item"), which is the maximum permissible charge for a specific item of DME based on its Healthcare Common Procedure Coding System ("HCPCS") Code, which provides specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under that specific HCPCS Code.

44.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

45.     The DME Fee Schedule uses HCPCS Codes promulgated by Palmetto to identify the maximum charge for selling specific DME and for renting Fee Schedule items on a weekly basis.

46.     Where a specific piece of DME does not have a maximum reimbursement rate in the DME Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the <u>lesser</u> of: (i) 150% of the acquisition cost to the provider; <u>or</u> (ii) the usual and customary price charged to the general public.

47.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." <u>See</u> New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

48.     Effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for rental charges of DME that do not have a reimbursement rate in the DME Fee

Schedule or is not specifically identified within the DME Fee Schedule.

49.    For dates of service on or after June 1, 2023, Part E of Appendix 17-C of 11 N.Y.C.R.R. 68 establishes calculations for the maximum permissible daily rental rates of Non-Fee Schedule items and the maximum total accumulated charges, as follows:

> (d)(1)  On or after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth the acquisition cost to the provider.  Rental charges for less than one month shall be calculated on a pro-rated basis using a 30-day month.
>
> (2)    The total accumulated rental charge for such durable medical equipment shall be the least of the:
>
> > (i)    Acquisition cost plus 50%;
> >
> > (ii)    Usual and customary price charged by durable medical equipment providers to the general public; or
> >
> > (iii)    Purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

50.    In essence, these new calculations establish a daily rental rate for Non-Fee Schedule items at $1/300^{th}$ of the acquisition cost and establish a maximum total rental reimbursement per patient that is not to exceed the lesser of 150% of the acquisition cost of the item, the usual and customary price charged by other DME providers to the general public, or the purchase fee established in the Fee Schedule.

51.    Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

> (i)    The provider is in compliance with all significant statutory and regulatory requirements;
>
> (ii)    The provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)    The prescription for DME is not based on any unlawful financial arrangement;

(iv)    The DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(v)    The HCPCS Code identified in the bill actually represents the DME that was provided to the patient; and

(vi)    The fee sought for DME provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule, the standard used for a Non-Fee Schedule item, or the *pro rata* monthly rental fee sought for renting DME to an Insured based on the standard for calculating rental reimbursement.

## II.    Defendants' Fraudulent Scheme

### A.    The DME Providers' Common Secret Ownership

52.    The John Doe Defendants conspired with the Paper Owner Defendants to implement a complex fraudulent scheme in which the DME Providers were used consecutively and in conjunction with each other to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

53.    While the DME Providers were formed and listed as being independently owned by one of the Paper Owner Defendants, both of the DME Providers were actually controlled by the Secret Owner, who also profited from the fraudulent scheme committed against GEICO and other New York automobile-insurers.

54.    The Secret Owner was able to secretly control and profit from the DME Providers by using each of the Paper Owner Defendants as "straw" owners who would place their name on documents that needed to be filed with the State of New York and City of New York in order to lawfully operate the DME Providers.

55.    In keeping with the fact that the Secret Owner actually owned, controlled, and profited from the DME Providers, and used the Paper Owner Defendants to further the fraudulent

14

scheme herein, there is significant overlap in the operations of the various DME Providers that could only exist through the Secret Owner's involvement.

56.     For example, the DME Providers both predominantly billed for the same five (5) items of DME, namely osteogenesis stimulators, CCTS with attendant accessories, PCDs, PEMF Devices, and Triad Devices.

57.     Similarly, and as discussed further below, the DME Providers each billed GEICO using virtually identical HCPCS Codes in response to the prescriptions they received in relation to the Fraudulent Equipment, and to the extent they billed for Non-Fee Schedule Items, submitted billing to GEICO reflecting the same, arbitrary prices as follows:

| Item | Code | Charge |
|---|---|---|
| Cold Compression Therapy System | E1399 | $1,650.00 |
| Back Wrap (for CCTS) | E1399 | $375.00 |
| Cervical Wrap (for CCTS) | E1399 | $375.00 |
| Knee Wrap (for CCTS) | E1399 | $300.00 |
| Shoulder Wrap (for CCTS) | E1399 | $300.00 |
| Elbow Wrap (for CCTS) | E1399 | $225.00 |
| Triad 3LT Infrared Heat Pad with Low Level Light Therapy | E1399 | $2,200.00 or $1,800.00 |
| Pulsed Electromagnetic Therapy Device | E1399 | $4,766.24 |

58.     In further support of the fact that the DME Providers were operated by the Secret Owner as part of a common scheme, both BHDS Supply and Example Supply submitted fraudulent wholesale invoices generated by a company known as Top Notch Wholesale Inc. ("Top Notch Wholesale") purportedly reflecting DME purchases made by the DME Providers.

59.     Top Notch Wholesale is not a legitimate DME wholesaler. Rather, as discussed further below, Top Notch, which is allegedly operated by its owner Arthur Gitlevich ("Gitlevich"), is nothing more than a shell company used to launder insurance company payments to facilitate the payment of kickbacks as a part of No-Fault insurance schemes.

60.    Additionally, the DME Providers used the same collection law firm – Sanders Grossman Aronova, PLLC– which continues to actively seek collection on the fraudulent billing on behalf of each of the Pharmacy Provider Defendants through the filing of no-fault collection lawsuits and/or arbitrations.

61.    The Secret Owner, together with the Paper Owner Defendants, operated the DME Providers in the following sequential fashion in an effort to limit the amount of billing submitted from any one of the DME Providers and mask the common fraudulent scheme:

> (i)    BHDS Supply billed GEICO for dates of service between January 29, 2024 and August 12, 2024; and

> (ii)   Example Supply billed GEICO for dates of service beginning June 2, 2024 and continuing through the present.

62.    Further, as part of Defendants' efforts to mask the Secret Owner's operation and control of the DME Providers, GEICO attempted to verify the claims submitted by Defendants by way of examinations under oath, but the Paper Owner Defendants intentionally refused to appear and to provide testimony and/or documents because they would have bene unable to answer key questions about the DME Providers' operations and their testimony would reveal the fraudulent scheme and the secret ownership behind that scheme.

**B.    Overview of the Common Fraudulent Scheme**

63.     The Secret Owner, together with the Paper Owner Defendants, conceived and implemented a complex fraudulent scheme in which they used the DME Providers as vehicles to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits which Defendants were never entitled to receive.

64.    To maximize the amount of no-fault benefits Defendants could receive, the Secret Owner, along with the Paper Owner Defendants, used the DME Providers in sequential fashion to

divide the billing that they were submitting to no-fault insurance carriers, including GEICO.

65.    In keeping with the fact that the Defendants split their billing in order maximize the amount of no-fault benefits they could collect, the DME Providers operated in sequential order, with some overlap to allow more than one entity to bill no-fault insurance carriers, including GEICO, at a single time.

66.    Through the complex scheme, the Secret Owner and the Paper Owner Defendants used the DME Providers to bill and collect No-Fault Benefits from GEICO and other automobile insurers that they were never entitled to collect.  Specifically:

   (i)    Between January 29, 2024 and August 12, 2024, BHDS submitted more than $1.26 million in fraudulent claims to GEICO, has wrongfully obtained more than $145,000.00, and there is more than $900,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO; and

   (ii)   Between June 2, 2024 and the present, Example Supply submitted more than $1.91 million in fraudulent claims to GEICO, has wrongfully obtained more than $390,500.00, and there is more than $1.35 million in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO.

67.    Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of improper agreements with John Doe Defendants "2" through "10" who are associated with the Clinics who are not presently identifiable.

68.    As part of this scheme, Defendants obtained prescriptions for Fraudulent Equipment that were purportedly issued by various Referring Providers who purportedly treated Insureds at the various Clinics.

69.    None of Defendants marketed or advertised the DME Providers to the general public, and they lacked any genuine retail or office location, and operated without any legitimate

efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

70.     Similarly, the Paper Owner Defendants did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

71.     Instead, Defendants entered illegal, collusive agreements with the Clinics, John Doe Defendants, and Referring Providers and steered them to prescribe and direct large volumes of prescriptions to the DME Providers for the specifically targeted Fraudulent Equipment.

72.     Defendants received the prescriptions for Fraudulent Equipment, purportedly issued by the Referring Providers, as part of the unlawful financial arrangements with the John Doe Defendants, directly from the Clinics and without going through the Insureds.

73.     Unlike legitimate medical supply companies that dispense a variety of DME devices and healthcare related products, the DME Providers intentionally targeted the Fraudulent Equipment so they could submit inflated claims for reimbursement to GEICO.

74.     This scheme enabled Defendants to maximize the amount of No-Fault Benefits they could obtain from GEICO and other New York automobile insurers through the submission of claims for Fraudulent Equipment.

75.     But for the payment of kickbacks from Defendants, the John Doe Defendants and Referring Providers would not have had any reason to issue large volumes of prescriptions for Fraudulent Equipment and to route those prescriptions to the DME Providers.

76.     Furthermore, as part of the scheme, and in a way to maximize the amount of money that Defendants could obtain from GEICO and other automobile insurers, at times the prescriptions

for Fraudulent Equipment that were purportedly issued by the Referring Providers and used by Example Supply to dispense and bill for osteogenesis stimulators were generic and vague, prescribing a "home based low intensity ultrasound device".

77.    Defendants used the intentionally generic and vague prescriptions to unlawfully choose what type of DME to provide to the Insureds.  As a result, in virtually every circumstance available, Defendants purported to provide the Insureds with an osteogenesis stimulator that had a high reimbursement rate under the applicable fee schedule.

78.    In addition to unlawfully choosing to dispense an osteogenesis stimulator in response to a prescription for a "home based low intensity ultrasound device", Example Supply submitted bills to GEICO seeking reimbursement for a specific type of osteogenesis stimulator with a HCPCS Code that was not directly identified in the prescriptions.

79.    By submitting bills to GEICO seeking No-Fault Benefits for osteogenesis stimulators based upon a specific HCPCS Code, Example Supply falsely represented that they provided Insureds with the particular items associated with the unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME.

80.    In furtherance of their scheme to defraud GEICO and other automobile insurers, Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the lesser of 150% of Defendants' legitimate acquisition cost or the cost to the general public for the same item.

81.    In actuality, the bills from Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of Defendants' legitimate acquisition cost or the cost to the general public.

82.    As a further part of this scheme, Defendants submitted bills to GEICO with reimbursement rates that indicated the Non-Fee Schedule items purportedly provided Insureds were expensive and high-quality, when the Fraudulent Equipment provided were cheap and poor-quality, and were purchased from wholesalers for a small fraction of the reimbursement rates contained in the bills.

83.    In fact, the cheap and poor-quality Fraudulent Equipment provided to the Insureds – again, to the extent that any Fraudulent Equipment was actually provided – were easily obtainable from legitimate internet or brick-and-motor retailers for a small fraction of the reimbursement rates identified in the bills submitted to GEICO by Defendants.

84.    After obtaining the prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers as a result of paying various forms of consideration, Defendants would bill GEICO through the DME Providers for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment at grossly inflated reimbursement rates; (iii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; and/or (iv) Fraudulent Equipment that was otherwise not reimbursable.

**C.    Defendants Failure to Comply with Local Licensing Provisions**

85.    As stated above, for a DME supplier to provide DME to automobile accident victims within the City of New York, the DME supplier must obtain a Dealer in Products License by the DCWP.

86.    For Defendants to lawfully provide DME to the Insureds identified in Exhibits "1" and "2", the DME Providers were required to obtain a Dealer in Products License because an overwhelming majority of the Insureds identified in Exhibits "1" and "2" were located within the City of New York.

87.    However, neither BHDS nor Example Supply ever obtained a Dealer in Products license issued by the DCWP.

88.    As a result, BHDS was not eligible to collect No-Fault Benefits because BHDS never obtained a Dealer in Products license issued by the DCWP.

89.    Similarly, Example Supply was not eligible to collect No-Fault Benefits because BHDS never obtained a Dealer in Products license issued by the DCWP.

90.    In each of the claims identified in Exhibits "1" and "2" Defendants fraudulently misrepresented that they were properly licensed with all local statutory and regulatory requirements and were lawfully permitted to provide DME to Insureds when Defendants were never eligible to collect No-Fault Benefits in the first instance because both BHDS and Example Supply failed to apply for or obtain a Dealer in Products license.

### D.    Defendants' Unlawful Financial Arrangements

91.    To obtain access to Insureds as part of their fraudulent scheme and maximize the No-Fault Benefits Defendants could obtain from GEICO and other New York automobile insurers, Defendants entered into unlawful financial agreements with the John Doe Defendants who are not presently identifiable but who are associated with the Clinics where prescriptions for Fraudulent Equipment were provided to Defendants in exchange for financial consideration.

92.    Since the inception of Defendants' fraudulent scheme, Defendants engaged in unlawful financial arrangements with the John Doe Defendants to obtain prescriptions for Fraudulent Equipment. These schemes allowed Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

93.    As part of the unlawful financial arrangements, Defendants would pay others who are not presently identifiable, including fictitious businesses, to obtain prescriptions for Fraudulent

Equipment purportedly issued by the Referring Providers at the Clinics.

94.     Defendants were able to enter unlawful financial arrangement schemes with the John Doe Defendants in order to obtain prescriptions purportedly issued by the Referring Providers because the Referring Providers operated at Clinics that are actually organized as "one-stop" shops for no-fault insurance fraud.

95.     These Clinics provide facilities for the Referring Providers, as well as a "revolving door" of medical professional corporations, all geared towards exploiting New York's no-fault insurance system.

96.     In fact, GEICO has received billing from an ever-changing number of fraudulent healthcare providers at a variety of different Clinics that were the sources of the prescriptions for Defendants, which start and stop operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

97.     For example, one of the Clinics from which Defendants obtained prescriptions was a No-Fault Clinic located at 611 East 76th Street, Brooklyn, New York (the "East 76th Street Clinic"), which is a Clinic with a "revolving door" of numerous healthcare providers. In fact, GEICO has received billing from over 130 different healthcare providers at the East 76th Street Clinic.

98.     Defendants also obtained prescriptions from a No-Fault Clinic located at 180-09 Jamaica Avenue, Jamaica, New York ("Jamaica Ave Clinic"), which is a Clinic with a "revolving door" of numerous healthcare providers. In fact, GEICO has received billing from over 100 different healthcare providers at the Jamaica Ave Clinic.

99.    As another example, Defendants obtained prescriptions from a No-Fault Clinic located at 82-17 Woodhaven Boulevard, Queens, New York (the "Woodhaven Boulevard Clinic"), which is a Clinic with a "revolving door" of numerous healthcare providers. In fact, GEICO has received billing from over 80 different healthcare providers at the Woodhaven Boulevard Clinic.

100.    In addition, Defendants obtained prescriptions from a No-Fault Clinic located at 87-10 Northern Boulevard, Jackson Heights, New York (the "Northern Boulevard Clinic"), which is a Clinic with a "revolving door" of numerous healthcare providers. GEICO received billing from over 40 different healthcare providers at the Northern Boulevard Clinic.

101.    Pursuant to the unlawful financial arrangements, Defendants paid thousands of dollars in kickbacks to the John Doe Defendants or to fictitious businesses that existed for no legitimate purpose at the direction of the John Doe Defendants.

102.    Defendants were willing to pay thousands of dollars in kickbacks because the John Doe Defendants were able to direct prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers to Defendants, which Defendants used as a basis to support their fraudulent bills to GEICO.

103.    In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, Defendants submitted fraudulent invoices generated by Top Notch Wholesale to support of their billing to GEICO.

104.    Top Notch Wholesale is not a legitimate DME wholesaler. Rather, Top Notch Wholesale, and its owner Gitlevich, are drivers of fraudulent no-fault insurance schemes and have been sued multiple times for their involvement in such schemes, in which it was alleged they laundered funds to hide the existence of illegal financial arrangements between participants in No-Fault fraud schemes, including individuals who owned and/or managed No-Fault clinics. See

*Gov't Emps. Ins. Co. et al. v. Grody et al.*, 1:24-cv-04125(RER)(PK) (E.D.N.Y. 2024) *Gov't Emps. Ins. Co. et al. v. Poonawala et al.*, 1:22-cv-03063(PKC)(VMS) (E.D.N.Y. 2022), *Gov't Emps Ins. Co. et al. v. Grody et al.*, 1:22-cv-06187(RER)(PK) (E.D.N.Y. 2022), *Gov't Emps Ins. Co. et al. v. Ahmad et al.*, 1:22-cv-06713(RER)(PK) (E.D.N.Y. 2022).

105.    To that end, when deposed in connection with a separate no-fault insurance fraud action, Gitlevich invoked his Fifth Amendment privilege against self-incrimination when asked whether Top Notch Wholesale was formed for the sole purpose of laundering money as a part of numerous No-Fault fraud schemes.

106.    In keeping with the fact that the payments to invoices with Top Notch Wholesale were fraudulent and were part of Defendants overarching scheme to fraudulently bill GEICO for the Fraudulent Equipment and maximize the amount of No-Fault Benefits that they could obtain, the DME Providers never paid Top Notch Wholesale anything close to the amount of money reflected on the invoices.

107.    For example, in support of their bills and their sought-after reimbursements, BHDS submitted the following invoices representing that BHDS bought numerous items of DME from Top Notch Wholesale:

(i)     Invoice dated January 15, 2024, purporting to represent that BHDS purchased $516,609.70 worth of DME from Top Notch Wholesale;

(ii)    Invoice dated March 4, 2024, purporting to represent that BHDS purchased $586,945.10 worth of DME from Top Notch Wholesale;

(iii)   Invoice dated April 11, 2024, purporting to represent that BHDS purchased $343,178.05 worth of DME from Top Notch Wholesale;

(iv)    Invoice dated May 1, 2024, purporting to represent that BHDS purchased $430,342.75 worth of DME from Top Notch Wholesale; and

(v)     Invoice dated June 12, 2024, purporting to represent that BHDS purchased $447,863.35 worth of DME from Top Notch Wholesale.

108.    However, BHDS never paid Top Notch Wholesale any amount of money in exchange for DME. Even more, bank records from Top Notch Wholesale for the time period of the purported invoices absolutely show no financial transactions from BHDS to Top Notch Wholesale's account for any amount of money.

109.    Similarly, in support of their bills and their sought-after reimbursements, Example Supply submitted the following invoices representing that Example Supply bought numerous items of DME from Top Notch Wholesale:

> (i)    Invoice dated June 21, 2024, purporting to represent that Example Supply purchased $424,953.10 worth of DME from Top Notch Wholesale;
>
> (ii)    Invoice dated September 18, 2024, purporting to represent that Example Supply purchased $554,443.25 worth of DME from Top Notch Wholesale; and
>
> (iii)    Invoice dated October 24, 2024, purporting to represent that Example Supply purchased $490,184.05 worth of DME from Top Notch Wholesale.

110.    However, Example Supply only issued a single check to Top notch Wholesale on July 25, 2024, for $7,500.00. Example Supply did not pay anything close to approximate $1.5 million represented on the three invoices. In fact, the money paid by Example Supply, along with the other funds that Top Notch Wholesale received, was converted to cash by Gitlevich.

111.    All of the invoices submitted by BHDS and Example Supply were completely fabricated because Top Notch Wholesale is not an actual DME wholesaler. Instead, Top Notch Wholesale, like other entities that are owned by Gitlevich, solely exists to funnel money into cash. In fact, Top Notch Wholesale has no business address, and its purported address of 700 Welsh Road, No. 216, Huntingdon Valley, Pennsylvania is nothing more than a residential apartment.

112.    Gitlevich was able to funnel payments received to cash because virtually all the money received by Top Notch Wholesale was issued to ADG International, which is another entity owned by Gitlevich, and then cashed at a check-cashing facility in Pennsylvania.

113. Further, Gitlevich testified on behalf of himself and Top Notch Wholesale in connection with the Gov't Emps. Ins. Co. v. Poonawala case in April of 2024 during which he confirmed the address used by Top Notch Wholesale is Gitelvich's home address and then asserted his 5th Amendment privilege against self-incrimination to virtually all questions, including questions regarding if Top Notch Wholesale performed any legitimate business services and if Top Notch Wholesale was formed solely to launder money as part of numerous no-fault insurance schemes.

114. In further support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, BHDS issued at least one check to Irina Zayonts ("I. Zayonts"). I. Zayonts was indicted in the Southern District of New York in 2012 in connection with a $300 million no-fault insurance fraud scheme. She pleaded guilty to various counts in 2014 and was sentenced to two years' probation.

115. I. Zayonts has also been sued in connection with her involvement in No-Fault fraud schemes in which it was alleged she secretly and unlawfully owned, operated, managed, and controlled various medical practices. See, e.g. Gov't Employees Ins. Co. et al. v. Grody et al., 1:24-cv-04125(RER)(PK) (E.D.N.Y. 2024) Gov't Employees Ins. Co. et al. v. Poonawala et al., 1:22-cv-03063(PKC)(VMS) (E.D.N.Y. 2022), Gov't Employees Ins. Co. et al. v. Grody et al., 1:22-cv-06187(RER)(PK) (E.D.N.Y. 2022).

116. In almost all the cases identified above where I. Zayonts was named as a defendant, Top Notch Wholesale was used by Gitlevich to funnel kickback payments into cash. In fact, Top Notch Wholesale was named as defendants in Gov't Emps. Ins. Co. v. Grody, et al., 1:22-cv-06187-RER-PK, and Gov't Emps. Ins. Co. v. Poonawala, et al., 1:22-cv-03063(PKC)(VMS).

117. In addition, Gitlevich was also named as a defendant in Gov't Emps. Ins. Co. v.

Grody, et al., 1:24-cv-04125-FB-MMH, for funneling money through in the same manner through another entity owned by Gitlevich.

118.    In further support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, and as explained in detail below, the prescriptions were not medically necessary and were provided pursuant to predetermined fraudulent protocols.

119.    In keeping with the fact that Defendants obtained prescriptions for Fraudulent Equipment were not medically unnecessary and provided pursuant to predetermined fraudulent protocols and, Defendants: (i) received prescriptions for predetermined items of Fraudulent Equipment from Referring Providers operating out of various Clinics; and (ii) upon information and belief, obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

120.    Furthermore, upon information and belief and to the extent that the Insureds received any Fraudulent Equipment, the Insureds were provided with Fraudulent Equipment directly from the Clinics, typically from the receptionists, without any involvement from Defendants.

121.    In keeping with the fact that Defendants obtained prescriptions for Fraudulent Equipment that were never actually issued by the Referring Provider, as described in more detail below, the DME Providers submitted bills to GEICO based upon prescriptions for Fraudulent Equipment that, at times: (i) were undated; and/or (ii) were issued on a date that the Insured was not treated by the Referring Provider who purportedly issued the prescription.

122.    In all of the claims identified in Exhibits "1" and "2", Defendants falsely represented that Fraudulent Equipment was provided pursuant to lawful prescriptions from healthcare providers and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions

were provided pursuant to unlawful financial arrangements.

### E. The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols

123.    In addition to the unlawful financial arrangements between Defendants and the John Doe Defendants the prescriptions that were provided to Defendants were the result of predetermined fraudulent protocols between and among Defendants, the John Doe Defendants and the Referring Providers.

124.    The predetermined fraudulent protocols were implemented solely to maximize the billing that Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

125.    In the claims identified in Exhibits "1" and "2", virtually all the Insureds were involved in relatively minor and low impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

126.    In keeping with the fact that many of the Insureds identified in Exhibits "1" and "2" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

127.    To the extent that the Insureds in the claims identified in Exhibits "1" and "2" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

128.    Despite virtually all of the Insureds being involved in relatively minor and low impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds identified in Exhibits "1" and "2" were subject to

similar treatment, including prescriptions for one or more items of Fraudulent Equipment that was dispensed by BHDS Supply and/or Example Supply.

129.    The Referring Providers issued prescriptions for Fraudulent Equipment to the Insureds identified in Exhibits "1" and "2" pursuant to predetermined fraudulent protocols without regard for the Insureds individual presentation.

130.    No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued upon the fraudulent protocols described below.

131.    In general, Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers pursuant to the following predetermined fraudulent protocols:

(i)    an Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;

(ii)    the Insured would be seen by a Referring Provider;

(iii)    on the date of the first or a subsequent visit, the Referring Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME;

(iv)    subsequently, to the extent the Insured returned to the Clinic for one or more additional evaluations and treatment, they were, at times, provided with at least one additional prescription for a predetermined set of DME, and

(v)    at least one, if not more than one, prescription for DME would be directly provided to Defendants to fill and was without any involvement by the Insured.

132.    Virtually all of the claims identified in Exhibits "1" and "2" are based upon medically unnecessary prescriptions for predetermined items of Fraudulent Equipment, which were purportedly issued by the Referring Providers who practiced at various Clinics across the New York metropolitan area.

133.    Based on the boilerplate treatment plans, with predetermined Fraudulent Equipment, Defendants billed voluminous, excessive amounts of medically unnecessary DME, as part of their collusive arrangements.  In many cases, Defendants' billing for the predetermined Fraudulent Equipment through the DME Providers was so egregious that it wasted away a substantial part of each Insured's $50,000.00 limit of No-fault Benefits, jeopardizing the ability of the Insureds to obtain truly needed healthcare services as a result of their automobile accidents.

134.    For example:

(i)     On July 28, 2024, Insured GF was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by Example Supply beginning on December 3, 2024, resulting in charges totaling $19,937.94 for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

(ii)    On July 29, 2024, Insured TH was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by Example Supply beginning on December 3, 2024, resulting in charges totaling $19,692.94 for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

(iii)   On August 22, 2024, Insured FA was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by Example Supply beginning on December 18, 2024, resulting in charges totaling $19,712.94 for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

(iv)    On September 5, 2024, Insured JR was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by Example Supply beginning on December 18, 2024, resulting in charges totaling $19,187.94 for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

(v)     On September 26, 2024, Insured JE was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by Example Supply beginning on December 18, 2024, resulting in charges totaling $17,717.94 for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits

available to the Insured for any legitimate, medically necessary healthcare services.

(vi)     On May 21, 2024, Insured AV was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by BHDS Supply, beginning on June 12, 2024, resulting in charges totaling $10,211.24 for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

(vii)    On May 23, 2024, Insured OG was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by BHDS Supply, beginning on June 12, 2024, resulting in charges totaling $10,211.24 for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

(viii)   On May 21, 2024, Insured EC as involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by BHDS Supply, beginning on June 12, 2024, resulting in charges totaling $9,986.24 for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

(ix)     On May 23, 2024, Insured EP was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by BHDS Supply, beginning on June 12, 2024, resulting in charges totaling $9,986.24 for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

(x)      On May 23, 2024, Insured DO was involved in a motor vehicle accident and reportedly received multiple prescriptions for Fraudulent Equipment allegedly dispensed by BHDS Supply, beginning on June 12, 2024, resulting in charges totaling $9,686.24 for the Fraudulent Equipment alone, substantially reducing the $50,000.00 in No-fault benefits available to the Insured for any legitimate, medically necessary healthcare services.

135.    These are only representative examples.

136.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.

137.    Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider may – but does not always – prescribe DME that should aid in the treatment of the patient's symptoms. The specific DME that would be prescribed to aid the treatment of the patient would always directly relate to the patients' individual symptoms or presentation.

138.    In determining whether to prescribe DME to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual symptoms or presentation.

139.    If a healthcare provider determines that DME is medically necessary after taking into account a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME was prescribed and why.

140.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

141.    Further, in a legitimate setting, when a patient returns for an examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or newly issued DME.

142.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual

is injured in a given automobile accident.

143.    It is improbable – to the point of impossibility – that Insureds involved in automobile accidents would routinely receive prescriptions for several identical items of Fraudulent Equipment.

144.    Insureds routinely receiving multiple items of identical Fraudulent Equipment would, by extension, mean Insureds routinely complained of the exact same symptoms.

145.    It is extremely improbable – to the point of impossibility – that a substantial number of Insureds who were involved in the same accident and were purportedly issued Fraudulent Equipment from the DME Providers, would require numerous identical items of DME.

146.    In keeping with the fact that the DME dispensed by the DME Providers were not medically necessary and were prescribed and dispensed pursuant to predetermined protocols to maximize profits, the DME Providers routinely received prescriptions for substantially identical – if not exactly identical – DME issued to Insureds involved in the same accident.

147.    For example:

  (i)    On March 26, 2024 three Insureds – LJM, JT, DC – were involved in the same automobile accident. Thereafter, LJM, JT, and DC all presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a Triad Device, and a CCTS with attendant accessories, both billed to GEICO under HCPCS E1399 pursuant to virtually identical prescriptions. LJM, JT, and DC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.  Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by BHDS Supply.

  (ii)   On March 28, 2024, two Insureds – RR and VM – were involved in the same automobile accident. Thereafter, RR and VM both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a Triad Device, CCTS with attendant accessories, both billed to GEICO under HCPCS E1399 and osteogenesis stimulator billed to GEICO under E0747,

pursuant to virtually identical prescriptions. RR and VM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by BHDS Supply.

(iii)   On April 7, 2024 two Insureds – EF and PF – were involved in the same automobile accident. Thereafter, EF and PF both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a Triad Device, and a CCTS with attendant accessories, both billed to GEICO under HCPCS E1399 pursuant to virtually identical prescriptions. EF and PF were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by BHDS Supply.

(iv)   On April 20, 2024 two Insureds – JP and JR – were involved in the same automobile accident. Thereafter, JP and JR both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a Triad Device, a CCTS with attendant accessories, and a PEMF, all billed to GEICO under HCPCS E1399. JP and JR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different.  Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by BHDS Supply.

(v)   On May 1, 2024, two Insureds – DR and RC – were involved in the same automobile accident. Thereafter, DR and RC both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a Triad Device, and CCTS with attendant accessories, both billed to GEICO under HCPCS E1399, pursuant to virtually identical prescriptions. DR and RC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by BHDS Supply.

(vi)   On July 11, 2024 two Insureds – KS and RS – were involved in the same

34

automobile accident. Thereafter KS and RS both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a CCTS with attendant accessories, billed to GEICO under HCPCS E1399, pursuant to virtually identical prescriptions. KS and RS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Example Supply.

(vii)    On June 8, 2024 two Insureds – JF and RR – were involved in the same automobile accident. Thereafter JF and RR both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a CCTS with attendant accessories, billed to GEICO under HCPCS E1399, pursuant to virtually identical prescriptions. JF and RR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Example Supply.

(viii)   On June 2, 2024 two Insureds – DM and JD – were involved in the same automobile accident. Thereafter DM and JD both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a CCTS with attendant accessories, billed to GEICO under HCPCS E1399, pursuant to virtually identical prescriptions. DM and JD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Example Supply.

(ix)     On August 18, 2024 two Insureds – MK and SD – were involved in the same accident. Thereafter, MK and SD both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a PCD and a PEMF, billed to GEICO under HCPCS E0675 and E1399, respectively, pursuant to virtually identical prescriptions. MK and SD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Example Supply.

(x)  On July 8, 2024 two Insureds – JD and RJ – were involved in the same accident. Thereafter, JD and RJ both presented to the same multidisciplinary clinic. Shortly after a purported examination at the multidisciplinary clinic, they were each purportedly prescribed a PCD, an osteogenesis stimulator, and a PEMF, billed to GEICO under HCPCS E0675, E0747, and E1399, respectively, pursuant to virtually identical prescriptions. JD and RJ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle.  To the extent that they suffered any injuries at all in the accident, their injuries were almost certainly different. Even so, these Insureds received or purportedly received virtually identical prescriptions for Fraudulent Equipment that was dispensed by Example Supply.

148.    These are only representative examples.

149.    It is even more improbable – to the point of impossibility – that an overwhelming amount of the Insureds identified in Exhibits "1" and "2" who treated at various Clinics would receive virtually identical prescriptions for multiple items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

150.    In further keeping with the fact that the prescriptions for Fraudulent Equipment used by Defendants to support the charges identified in Exhibit "2" were for medically unnecessary Fraudulent Equipment, and obtained as part of a predetermined fraudulent protocol, at times, the prescriptions filled by Example Supply were purportedly issued on dates that the Insureds never treated with the Referring Providers.

151.    For example:

(i)  Insured CP was allegedly involved in a motor vehicle accident on July 3, 2024. On July 17, 2024 Example Supply purportedly provided CP with a PCD, osteogenesis stimulator, and a PEMF Device pursuant to prescription purportedly issued by Nick Nicoloff, RPA-C ("PA Nicoloff") on July 10, 2024, when PA Nicoloff did not examine or otherwise treat CP on July 10, 2024.

(ii)  Insured VI was allegedly involved in a motor vehicle accident on March 23, 2024. On July 18, 2024, Example Supply purportedly provided VI with a CCTS and attendant accessories pursuant to a prescription purportedly issued by Reginald Derosena PA ("PA Derosena") on July 18, 2024, when PA Derosena did not examine or otherwise treat VI on July 18, 2024.

(iii)    Insured JS was allegedly involved in a motor vehicle accident on June 9, 2024. On July 17, 2024, Example Supply purportedly provided JS with a CCTS with attendant accessories pursuant to a prescription purportedly issued by PA Derosena on July 17, 2024, when PA Derosena did not examine or otherwise treat JS on July 17, 2024.

(iv)    Insured JD was allegedly involved in a motor vehicle accident on May 16, 2024. On August 2, 2024, Example Supply purportedly provided JD with a PCD, osteogenesis stimulator, and PEMF pursuant to prescriptions purportedly issued by Michael Younan DC ("Dr. Younan") on July 26, 2024, when Dr. Younan did not examine or otherwise treat JD on July 26, 2024.

(v)    Insured LE was allegedly involved in a motor vehicle accident on August 30, 2024. On October 3, 2024 Example Supply purportedly provided LE with a PEMF pursuant to a prescription purportedly issued by Omar Sayeed MD ("Dr. Sayeed") on September 23, 2024, Dr. Sayeed did not examine or otherwise treat LE on September 23, 2024.

(vi)    Insured GN was allegedly involved in a motor vehicle accident on September 17, 2024. On October 8, 2024 Example Supply purportedly provided GN with a PCD, osteogenesis stimulator, and PEMF Device pursuant to prescription purportedly issued by PA Nicoloff on September 27, 2024, when PA Nicoloff did not examine or otherwise treat GN on September 27, 2024.

(vii)    Insured AGA was allegedly involved in a motor vehicle accident on October 19, 2024. On October 25, 2024 Example Supply purportedly provided AGA with a PCD, osteogenesis stimulator, and a PEMF Device pursuant to prescription purportedly issued by PA Nicoloff on October 24, 2024, when PA Nicoloff did not examine or otherwise treat AGA on October 24, 2024.

(viii)    Insured AA was allegedly involved in a motor vehicle accident on September 27, 2024. On November 29, 2024 Example Supply purportedly provided AA with an osteogenesis stimulator and CCTS with attendant accessories pursuant to prescription purportedly issued by Elizabeth Lafargue NP ("NP Lafargue") on November 27, 2024, when NP Lafargue did not examine or otherwise treat AA on November 27, 2024.

(ix)    Insured JW was allegedly involved in a motor vehicle accident on October 23, 2024. On November 11, 2024 Example Supply purportedly provided JW with a PCD, osteogenesis stimulator, and a PEMF Device pursuant to prescription purportedly issued by PA Nicoloff on November 7, 2024, when PA Nicoloff did not examine or otherwise treat JW on November 7, 2024.

(x)    Insured DG was allegedly involved in a motor vehicle accident on September 5, 2024. On December 2, 2024 Example Supply purportedly

provided DG with an osteogenesis stimulator pursuant to a prescription purportedly issued by Dr. Sayeed on November 4, 2024, when Dr. Sayeed did not examine or otherwise treat DG on November 4, 2024.

152.    These are only representative examples.

153.    Furthermore, and in keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were obtained as part of a predetermined fraudulent protocol, there were often significant delays between the date on which the prescription was issued and the date on which it was delivered to the Insured.

154.    For example:

(i)     Insured XO was allegedly involved in a motor vehicle accident on December 28, 2023. Thereafter, OA sought treatment with Gaetan Jean Marie NP ("NP Jean Marie") at the Northern Boulevard Clinic. On December 28, 2023, NP Jean Marie purportedly issued prescriptions to XO for a CCTS and PEMF which were delivered to XO by BHDS over a month and a half later, on February 15, 2024.

(ii)    Insured MR was allegedly involved in a motor vehicle accident on January 26, 2024. Thereafter, MR sought treatment with Kimberly Johnson NP ("NP Johnson") at the Woodhaven Boulevard Clinic). On January 31, 2024, NP Johnson purportedly issued a prescription to MR for a Triad Device which was delivered to MR by BHDS approximately one month later, on March 1, 2024.

(iii)   Insured JN was allegedly involved in a motor vehicle accident on January 13, 2024. Thereafter, JN sought treatment with NP Johnson at the Northern Boulevard Clinic. On January 16, 2024, NP Johnson purportedly issued prescriptions to JN for a PEMF Device and a CCTS with attendant accessories which were delivered to JN by BHDS nearly one month later, on February 10, 2024 and February 16, 2024, respectively.

(iv)    Insured NC was allegedly involved in a motor vehicle accident on February 14, 2024. Thereafter, NC sought treatment with NP Johnson at the Woodhaven Boulevard Clinic. On February 19, 2024, NP Johnson purportedly issued prescriptions to NC for a Triad Device and a CCTS with attendant accessories which were delivered to NC by BHDS over two weeks later, on March 1, 2024.

(v)     Insured KL as allegedly involved in a motor vehicle accident on March 10, 2024. Thereafter, KL sought treatment with NP Johnson at the Woodhaven Boulevard Clinic. On April 17, 2024, NP Johnson purportedly issued

prescriptions to KL for a Triad Device and CCTS with attendant accessories which were delivered to KL by BHDS over two weeks later on May 3, 2024.

(vi)    Insured SP was allegedly involved in a motor vehicle accident on June 4, 2024. Thereafter, SP sought treatment with Wei Hong Xu, NP ("NP Xu") at a No-Fault Clinic located at 611 East 76th Street, Brooklyn, NY (the "611 East 76th Street Clinic"). On June 19, 2024, NP Xu purportedly issued a prescription for a CCTS with attendant accessories which were delivered to SP by BHDS nearly one month later on July 17, 2024.

(vii)    Insured MM was allegedly involved in a motor vehicle accident on October 3, 2024. Thereafter, he sought treatment with Yledede Cummings NP ("NP Cummings") of Beach Medical Rehabilitation PC ("Beach Medical") at a No-Fault Clinic located at 1 Cross Island Plaza, Suite 323, Rosedale, New York (the "Cross Island Plaza Clinic"). On November 12, 2024 NP Cummings purportedly issued prescriptions to MM for a Triad Device, a PCD Device, a Cure Max Handheld Pain Relief Laser Therapy Device ("Cure Max Device"), a CCTS with attendant accessories, and an osteogenesis stimulator which were delivered to MM by Example Supply over one month later, on December 18, 2024.

(viii)    Insured THS was allegedly involved in a motor vehicle accident on September 30, 2024. Thereafter, he sought treatment with NP Cummings of Beah Medical at the Cross Island Plaza Clinic. On November 13, 2024, NP Cummings purportedly issued prescriptions to THS for a Triad Device, a PCD Device, a Cure Max Device, a CCTS with attendant accessories, an osteogenesis stimulator, and a PEMF, which were delivered to THS by Example Supply over one month later on December 18, 2024.

(ix)    Insured KOE was allegedly involved in a motor vehicle accident on September 15, 2024. Thereafter, she sought treatment with NP Cummings of Beah Medical at the Cross Island Plaza Clinic. On November 21, 2024, NP Cummings purportedly issued prescriptions to KOE for a Triad Device, a PCD Device, a Cure Max Device, a CCTS with attendant accessories, an osteogenesis stimulator, and a PEMF, which were delivered to KOE by Example Supply nearly one month later on December 18, 2024.

(x)    Insured DW was allegedly involved in a motor vehicle accident on September 23, 2024. Thereafter, he sought treatment with NP Cummings of Beah Medical at the Cross Island Plaza Clinic. On November 27, 2024, NP Cummings purportedly issued prescriptions to DW for a Triad Device, a PCD Device, a Cure Max Device, a CCTS with attendant accessories, an osteogenesis stimulator, and a PEMF, which were delivered to DW by Example Supply three weeks later on December 18, 2024.

155.    These are only representative examples.

156.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" and "2" were part of predetermined protocols designed to maximize profits, and not based upon medical necessity, Defendants took affirmative steps to conceal the amount of DME being dispensed to individual Insureds through the DME Providers.

157.    Specifically, at the behest of the John Doe Defendants, the Referring Providers would often issue multiple prescriptions for DME on the same date.  The DME Providers would then submit a separate bill to GEICO for each separate prescription.

158.    For example:

(i)     An Insured named AAV was allegedly involved in a motor vehicle accident on March 25, 2024.  On April 2, 2024, AAV received a prescription for a Triad, and a separate prescription for a CCTS and attendant accessories from Sherly Varghese NP ("NP Varghese"). BHDS Supply then submitted two separate bills to GEICO for these items when they were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| AAV | April 15, 2024 | (i) Cold Compression Therapy System 4 Level, (ii) Back wrap, adjustable, (iii) Cervical Spine Wrap, adj, and (iv) shoulder wrap & gel pack, adj |
| AAV | April 15, 2024 | Triad 3LT Infrared Heating Pad System |

(ii)    An Insured named DS was allegedly involved in a motor vehicle accident on March 26, 2024.  On April 1, 2024, DS received a prescription for a Triad, a separate prescription for a CCTS and attendant accessories, and a third prescription for a PEMF device from NP Johnson. BHDS Supply then submitted three separate bills to GEICO for these items that were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| DS | April 11, 2024 | Pulsed Electromagnetic Therapy Device |
| DS | April 11, 2024 | (i) Cold Compression Therapy System 4 Level, (ii) Back wrap, adjustable, (iii) Cervical Spine Wrap, adj, and (iv) wrist wrap & gel pack, adj |
| DS | April 11, 2024 | Triad 3LT Infrared Heating Pad System |

(iii)   An Insured named BO was allegedly involved in a motor vehicle accident

on March 26, 2024.  On April 3, 2024, BO received a prescription for a Triad Device and a separate prescription for a CCTS and attendant accessories from NP Jean Marie. BHDS Supply then submitted two separate bills to GEICO for these items that were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| BO | April 11, 2024 | (i) Cold Compression Therapy System 4 Level, (ii) Back wrap, adjustable, (iii) Cervical Spine Wrap, adj, (iv) Knee wrap & gel pack, adj, (v) Shoulder Wrap & Gel Pack adj, and (vi) Ankle Wrap & gel pack, adj |
| BO | April 11, 2024 | Triad 3LT Infrared Heating Pad System |

(iv)    An Insured named CG was allegedly involved in a motor vehicle accident on May 21, 2024.  On May 29, 2024, CG received a prescription for a PEMF device and a separate prescription for a CCTS and attendant accessories from NP Jean Marie. BHDS Supply then submitted two separate bills to GEICO for these items that were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| CG | June 12, 2024 | (i) Cold Compression Therapy System 4 Level, (ii) Back wrap, adjustable, and (iii) Knee wrap & gel pack, adj |
| CG | June 12, 2024 | Pulsed Electromagnetic Therapy Device |

(v)     An Insured named KP was allegedly involved in a motor vehicle accident on May 21, 2024.  On May 29, 2024, KP received a prescription for a Triad, a separate prescription for a PEMF device, and a third prescription for a CCTS and attendant accessories from NP Jean Marie. BHDS Supply then submitted three separate bills to GEICO for these items that were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| KP | June 12, 2024 | Triad 3LT Infrared Heating Pad System |
| KP | June 12, 2024 | (i) Cold Compression Therapy System 4 Level, (ii) Back wrap, adjustable, (iii) Cervical Spine Wrap, adj, (iv) Knee wrap & gel pack, adj, and (v) Shoulder Wrap & Gel Pack adj |
| KP | June 12, 2024 | Pulsed Electromagnetic Therapy Device |

(vi)    An Insured named AH was allegedly involved in a motor vehicle accident on September 27, 2024.  On November 20, 2024, AH received a prescription for a "home based low intensity ultrasound device" and a

separate prescription for a CCTS and attendant accessories from Ilya Kopach NP ("NP Kopach"). Example Supply then submitted two separate bills to GEICO for these items that were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| AH | November 22, 2024 | (i) Cold Compression Therapy System 4 Level, (ii) Back wrap, adjustable, (iii) Cervical Spine Wrap, adj, and (iv) Shoulder Wrap & Gel Pack adj |
| AH | November 22, 2024 | Osteogenesis stimulator, low intensity ultrasound |

(vii)   An Insured named OCG was allegedly involved in a motor vehicle accident on July 1, 2024.  On July 26, 2024, OCG received a prescription for a PCD and a separate prescription for an osteogenesis stimulator from Dr. Younan. Example Supply then submitted two separate bills to GEICO for these items that were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| OCG | August 2, 2024 | Osteogenesis stimulator, electrical, non-invasive, spinal applications |
| OCG | August 2, 2024 | Pneumatic Compression Device, high pressure, rapid inflation/deflation cycle, for arterial insufficiency (unilateral or bilateral system) |

(viii)  An Insured named CC was allegedly involved in a motor vehicle accident on November 4, 2024.  On November 7, 2024, CC received prescriptions for a CCTS and attendant accessories and a separate prescription for a Triad Device from Chadae Haffenden-Morrison, NP ("NP Haffenden-Morrison"). Example Supply then submitted two separate bills to GEICO for these items that were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
|---------|-----------------|------------------|
| CC | November 15, 2024 | (i) Cold Compression Therapy System 4 Level, (ii) Back wrap, adjustable, (iii) Cervical Spine Wrap, adj, (iv) Knee wrap & gel pack, adj, and (v) Shoulder Wrap & Gel Pack adj |
| CC | November 15, 2024 | Triad 3LT Infrared Heating Pad System |

(ix)    An Insured named ZP was allegedly involved in a motor vehicle accident on October 30, 2024.  On November 15, 2024, ZP received a prescription for a CCTS and attendant accessories and a separate prescription for a Triad

Device from Amanda Hussein, DC ("Dr. Hussein"). Example Supply then submitted two separate bills to GEICO for these items that were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
| --- | --- | --- |
| ZP | November 22, 2024 | (i) Cold Compression Therapy System 4 Level, (ii) Back wrap, adjustable, (iii) Cervical Spine Wrap, adj, and (iv) Shoulder Wrap & Gel Pack adj |
| ZP | November 22, 2024 | Triad 3LT Infrared Heating Pad System |

(x)     An Insured named AD was allegedly involved in a motor vehicle accident on May 22, 2024. On July 26, 2024, AD received a prescription for a PCD and a separate prescription for PEMF device from Dr. Younan. Example Supply then submitted two separate bills to GEICO for these items that were purportedly provided on the same day:

| Patient | Date of Service | Charges to GEICO |
| --- | --- | --- |
| AD | August 2, 2024 | Pulsed Electromagnetic Therapy Device |
| AD | August 2, 2024 | Pneumatic Compression Device, high pressure, rapid inflation/deflation cycle, for arterial insufficiency (unilateral or bilateral system) |

159.    These are only representative examples.

160.    Defendants coordinated the issuance of multiple prescriptions to the same Insured on the same date in an effort to conceal the amount of DME they dispensed to individual Insureds because they knew that submitting one bill to GEICO for large amounts of DME would likely arouse suspicion and draw attention to their fraudulent scheme.

161.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" and "2" were part of predetermined protocols designed to maximize profits, and not based upon medical necessity, at times Insureds received duplicative items of DME from multiple DME companies either pursuant to the same prescription or subsequent prescriptions issued by the same Referring Provider.

162.    For example:

(i)     Insured EHD was allegedly involved in a motor vehicle accident on May 13, 2024. GEICO received two different bills for an osteogenesis stimulator purportedly provided to EHB from two different DME companies on June 27, 2024, including BHDS and a non-party DME company. The bills were based upon what appears to be the same prescription issued by an unidentified Referring Provider on June 25, 2024.

(ii)    Insured JA was allegedly involved in a motor vehicle accident on May 11, 2024. GEICO received two different bills for an osteogenesis stimulator purportedly provided to AJ from a non-party DME company on June 12, 2024 and from BHDS on June 25, 2024. The bills were based upon two separate prescriptions purportedly issued by "Dr. Stephen Bruno", one on June 25, 2024 and one on an unidentified date.

(iii)   Insured TF was allegedly involved in a motor vehicle accident on May 10, 2024. GEICO received three different bills for an osteogenesis stimulator purportedly provided to TF from a non-party DME company on June 12, 2024, BHDS on June 27, 2024, and a non-party DME company also on June 27, 2024. All three bills were based upon three separate prescriptions purportedly issued by "Dr. Stephen Bruno" dated May 28, 2024, and June 25, 2024.

(iv)    Insured MM was allegedly involved in a motor vehicle accident on October 3, 2024. GEICO received two different bills for a PEMF device purportedly provided to MM from a non-party DME company on October 26, 2024 and from Example Supply on December 18, 2024. The bills were based upon two separate prescriptions purportedly issued by NP Cummings dated October 8, 2024, and November 12, 2024.

(v)     Insured KF was allegedly involved in a motor vehicle accident on August 24, 2024. GEICO received two different bills for a PCD purportedly provided to KF from Example Supply on December 18, 2024 and from a non-party DME company on December 23, 2024 and. The bills were based upon two separate prescriptions purportedly issued by NP Cummings dated November 12, 2024 and September 4, 2024.

(vi)    Insured SC was allegedly involved in a motor vehicle accident on July 8, 2024. GEICO received two different bills for a PEMF purportedly provided to SC from a non-party DME company on July 25, 2024, and from Example Supply on December 3, 2024. The bills were based upon two separate prescriptions purportedly issued by NP Cummings dated July 10, 2024, and November 21, 2024.

(vii)   Insured GN as allegedly involved in a motor vehicle accident on September 17, 2024. GEICO received two different bills for a PCD purportedly provided to GN from Example Supply on October 8, 2024, and from a non-party DME company on October 29, 2024. The bills were based upon two

separate prescriptions purportedly issued by PA Nicoloff dated September 27, 2024, and October 10, 2024.

163.    These are only representative examples.

164.    In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibits "1" – "2" were not medically necessary but were the result of a predetermined fraudulent protocol, the prescriptions at times contained vague and generic descriptions for DME, to allow Defendants to choose the specific type of Fraudulent Equipment that they billed GEICO and other New York automobile insurers.

165.    In further keeping with the fact that the prescriptions purportedly issued by the Referring Providers were medically unnecessary, when the Insureds continued to seek treatment with the Referring Providers, the follow-up examination reports generated by the Referring Providers often failed to discuss the Insureds' previously prescribed Fraudulent Equipment, whether the patients used the Fraudulent Equipment, or provide any indication whether to continue using any of previously prescribed Fraudulent Equipment.

166.    For the reasons set forth above, and below, in each of the claims identified in Exhibits "1" – "2", Defendants falsely represented that the Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME, and were therefore eligible to collect No-Fault Benefits in the first instance, when, in reality the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to Defendants pursuant to unlawful financial agreements.

167.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that there was a contemporaneously dated evaluation report, the evaluation report often failed to explain – and frequently failed to identify – the Fraudulent Equipment identified on

the prescriptions provided to Defendants and used by Defendants to bill GEICO for the charges identified in Exhibits "1" and "2".

168.    To the extent the evaluation reports identified and/or referenced the DME identified on the prescriptions provided to the DME Providers, the explanations were perfunctory and non-individualized.

169.    Furthermore, to the extent the evaluation reports referenced DME prescribed to the Insureds, the DME identified was often incomplete, or otherwise differed from what was purportedly prescribed and dispensed by the DME Providers and/or other non-party DME companies.

170.    By submitting bills to GEICO seeking No-Fault Benefits for the Fraudulent Equipment, Defendants represented that they provided Insureds DME that was medically necessary, as determined by a healthcare provider licensed to prescribe DME.

171.    However, the Fraudulent Equipment was not medically necessary. Rather it was prescribed pursuant to predetermined fraudulent protocols and collusive kickback arrangements among Defendants.

### a.    The Fraudulent Billing for CCTS

172.    As part of their fraudulent scheme, the Referring Providers purportedly prescribed, and Defendants purportedly provided and billed for CCTS and attendant accessories resulting in charges of, at a minimum, $1,650.00 per insured who purportedly received the device plus charges between $225.00 and $325.00 per accessory.

173.    Virtually all of the charges for CCTSs that Defendants submitted, or caused to be submitted, were pursuant to fraudulent prescription forms. The fraudulent prescription forms were distributed to the Referring Providers by Defendants and/or and John Doe Defendants to solicit

and steer prescriptions for CCTSs back to Defendants.

174.    The CCTSs purportedly dispensed by Defendants essentially provide cold therapy to a part of the patient's body, which is not more effective than using a standard ice pack and bandage.

175.    Where a patient is in a position to be able to place an ice-pack, there is no medically necessary reason to use a CCTS. This is especially true considering that medical studies have shown no difference in recovery or functionality of patients using a CCTS compared to an ice pack.

176.    Moreover, the use of cold-therapy – either in the form of an ice pack or a CCTS– subsequent to trauma to decrease swelling, is generally most effective during the first few days after acute injury.

177.    After the first few days, cold-therapy is only helpful to patients immediately after range of motion exercises performed during physical therapy. In that limited scenario, cold-therapy is typically provided by the physical therapist in the form of ice packs.

178.    It is improbable that a legitimate physician would issue a prescription for a CCTS to a patient greater than one week post-motor vehicle accident.

179.    It is also improbable that a legitimate physician would issue a prescription for a CCTS to a patient post-motor vehicle accident when that patient is able to use ice-packs.

180.    In keeping with the fact that the Fraudulent Equipment prescribed at various Clinics to the Insureds identified in Exhibits "1" and "2" were medically unnecessary and were provided pursuant to a predetermined fraudulent protocol, in the significant majority of instances the Insureds identified in Exhibits "1" and "2" were prescribed the CCTS more than a week after the accident, and long after the period when cold therapy and compression – or even an ice pack and

ACE bandage – would decrease swelling after the trauma from an automobile accident.

### b.    The Fraudulent Billing for Triad Devices

181.    As part of the fraudulent scheme, the Referring Providers also prescribed and the DME Providers purportedly dispensed the "Triad 3LT Infrared Heat Pad with Low Level Light Therapy" device resulting in charges of $2,220.00 per bill to GEICO.

182.    Virtually all of the charges for Triad Devices that Defendants submitted, or caused to be submitted, were pursuant to fraudulent prescription forms. The fraudulent prescription forms were distributed to the Referring Providers by Defendants and/or and John Doe Defendants to solicit and steer prescriptions for Triad Devices back to Defendants.

183.    To create the false impression that the devices dispensed by the DME Providers were medically necessary, many prescriptions for the Triad Devices contained the following language:

PRODUCT: Triad 3LT™ Infrared Heat Pad with Low Level Light Therapy (LLLT)
I am prescribing the Triad 3LT™ Infrared Heat Pad with Low Level Light Therapy (LLLT) which is an FDA Cleared device to treat and reduce musculoskeletal pain and inflammation. The Triad 3LT™ LLLT combines three wavelengths Infrared Heat (830nm and 950nm) and Red Light Laser (630nm) for deep soft tissue penetration; supported by multiple Published Level 1 Double-blind studies showing the clinical benefits of LLLT Photobiomodulation Therapy. The patient can treat their acute or chronic pain and inflammation at home. I certify that the Triad 3LT™ device is medically indicated and in my opinion is reasonable and necessary to treat this patient's condition.

L Ankle Pain

184.    Defendants provided the Triad Devices to Insureds who were purportedly experiencing musculoskeletal pain, including back, shoulder, and/or neck pain.

185.    In a legitimate clinical setting, treatment for neck, back, or shoulder pain should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

186.    If such conservative treatment does not resolve the patient's symptoms, the

standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication. These clinical approaches are well-established.

187.    By contrast, the Triad Devices are FDA cleared for "light based over the counter wrinkle reduction", not for the treatment or reduction of musculoskeletal pain and inflammation.

188.    Furthermore, policy bulletins by commercial insurers make clear that low level light therapy of the type purportedly provided by the Triad Devices is experimental and investigational and there is no legitimate body of evidence that establishes the effectiveness of low-level light therapy devices for the treatment of back, neck, or shoulder pain.

189.    Notwithstanding the experimental and investigational nature of low-level light therapy, Defendants repeatedly purported to dispense the expensive Triad Devices to numerous Insureds solely to maximize profits without regard to genuine patient care.

### c.    The Fraudulent Billing for PEMF Devices

190.    As part of the fraudulent scheme the Referring Providers prescribed and the DME Providers purportedly dispensed PEMF Devices resulting in charges of $4,766.24 per Insured.

191.    The PEMF Devices prescribed by the Referring Providers and purportedly dispensed by the DME Providers provide treatment that is considered experimental and investigational.

192.    Notwithstanding the experimental and investigational nature of Pulsed Electromagnetic Field therapy, Defendants repeatedly purported to dispense the expensive PEMF Devices to numerous Insureds solely to maximize profits without regard to genuine patient care.

193.    The Insureds to whom Defendants purported to provide Fraudulent Equipment were generally involved in relatively minor, low-impact "fender-bender" accidents, to the extent

they were involved in any accidents at all. They did not suffer any significant injuries or health problems as a result of the relatively minor accidents they experienced, nor did they exhibit any symptoms that would justify the use of an experimental and investigational PEMF Device.

194. Moreover, policy bulletins by commercial insurers make clear that pulsed electromagnetic stimulation is experimental and investigational and there is no legitimate body of evidence that establishes the effectiveness of PEMF Devices for the treatment of back, neck, or shoulder pain.

195. Virtually all the Insureds who received a PEMF Device were already enrolled in in multidisciplinary course of treatment at the No-Fault Clinics, including physical therapy and chiropractic care.

196. Moreover, virtually all the Insureds who received a PEMF Device and/or a Triad Device also received large volumes of other DME pursuant to the fraudulent billing and treatment protocols at the No-Fault Clinics where they were treating, such that there was no justification for the use of an additional experimental and investigational device such as the PEMF Device or the Triad Device.

### d.    The Fraudulent Billing for Osteogenesis Stimulators

197. As part of their fraudulent scheme, Defendants billed for purportedly dispensing Osteogenesis Stimulators under HCPCS E0747 and E0748 resulting in charges of $3,300.00 per Insured who purportedly received the device, even though – to the extent that any device was provided – the DME Providers only dispensed cheap, portable stimulation devices.

198. Osteogenesis Stimulators are devices used to encourage bone growth and accelerate fracture healing. Various commercial insurers have issued policy bulletins that make clear the use of an osteogenesis stimulator is only necessary to heal bone fractures under limited circumstances,

while CMS has published guidance stating that electrical osteogenesis stimulators billed under E0747 or E0748 are covered only in limited circumstances.

199. Specifically, CMS's published guidance states as follows:

A non-spinal electrical osteogenesis stimulator (E0747) is covered only if any of the following criteria are met:

1. Nonunion of a long bone fracture (see Appendices section) defined as radiographic evidence that fracture healing has ceased for three or more months prior to starting treatment with the osteogenesis stimulator, or
2. Failed fusion of a joint other than in the spine where a minimum of nine months has elapsed since the last surgery, or
3. Congenital pseudarthrosis.

Nonunion of a long bone fracture must be documented by a minimum of two sets of radiographs obtained prior to starting treatment with the osteogenesis stimulator, separated by a minimum of 90 days, each including multiple views of the fracture site, and with a written interpretation by a treating practitioner stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs.

A non-spinal electrical osteogenesis stimulator will be denied as not medically necessary if none of the criteria above are met…

A spinal electrical osteogenesis stimulator (E0748) is covered only if any of the following criteria are met:

1. Failed spinal fusion where a minimum of nine months has elapsed since the last surgery, or
2. Following a multilevel spinal fusion surgery (see Appendices section), or
3. Following spinal fusion surgery where there is a history of a previously failed spinal fusion at the same site.

See https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33796.

200. Notwithstanding the limited, accepted uses for Osteogenesis Stimulators, Defendants repeatedly purported to bill for expensive Osteogenesis Stimulators under HCPCS Code E0747 and E0748, with charges of $3,300.00 per device, which were purportedly dispensed to numerous Insureds who suffered no bone fractures or spinal fusions – all solely to maximize profits without regard to genuine patient care.

201.    In keeping with the fact that the Osteogenesis Stimulators were not medically necessary and were prescribed pursuant to predetermined fraudulent protocols, none of the charges submitted by Defendants were submitted based on a prescription from a medical doctor, orthopedist, or orthopedic surgeon. Rather, the vast majority of the charges for the Osteogenesis Stimulators were based on Fraudulent Prescriptions Forms allegedly issued by nurse practitioners, chiropractors, or physician's assistants.

202.    For the reasons set forth above, and below, in each of the claims identified  in Exhibits "1" and "2", Defendants falsely represented that Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME, and were, therefore, eligible to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to Defendants pursuant agreements with others who are not presently identifiable.

**F.    The Fraudulent Misrepresentation of the Permissible Reimbursement Rate**

203.    When Defendants submitted bills to GEICO for Non-Fee Schedule items under E1399, Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

204.    As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

205.    By submitting bills to GEICO for Non-Fee Schedule items, Defendants fraudulently represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

206. Instead, the DME Providers submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

207. The DME Providers were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment for which the acquisition cost was low.

208. In keeping with the fact that the DME Providers fraudulently represented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, the DME Providers purposefully submitting fraudulent acquisition invoices in conjunction with their bills purporting to reflect the purchase of the Fraudulent Equipment from Top Notch Wholesale.

209. The Top Notch Wholesale invoices fraudulently represented that the DME Providers purchased hundreds of thousands of dollars' worth of DME that purportedly included the Fraudulent Equipment billed to GEICO, when in reality, the DME Providers did not purchase any DME from Top Notch Wholesale.

210. To the extent that the DME Providers purchased any DME, they purposefully did not include legitimate invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

211. As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule

items identified in Exhibits "1" and "2" virtually always misrepresented the permissible reimbursement amount.

212.    The DME Providers' misrepresentations regarding Non-Fee Schedule items inflated the charges submitted to GEICO and resulted in the DME Providers obtaining payment from GEICO under the New York "No-Fault" laws to which the DME Providers were never entitled.

### G.    The Fraudulent Billing the DME Providers Submitted or Caused to be Submitted to GEICO

213.    To support their fraudulent charges, the DME Providers systematically submitted or caused to be submitted hundreds of NF-3 forms, and/or treatment reports to GEICO through and in the name of BHDS Supply and/or Example Supply, seeking payment for the Fraudulent Equipment.

214.    The NF-3 forms, and treatment reports that the DME Providers submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

> (i)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and therefore were eligible to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because, to the extent that the DME Providers provided any of Fraudulent Equipment, they were not properly licensed by the DCWP as they did not obtain Dealer for Products Licenses.

> (ii)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME, and therefore, were eligible to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because, to the extent that Defendants provided any Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; and (b) predetermined fraudulent protocols without regard for the medical necessity of the items.

(iii)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, delivery receipts, and attached documents uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because – to the extent that Defendants provided any Fraudulent Equipment to the Insureds – they falsified the permissible reimbursement amounts for Fraudulent Equipment identified in the NF-3 forms.

### III.    The DME Providers' Fraudulent Concealment and GEICO's Justifiable Reliance

215.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

216.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

217.    First, the Defendants regularly submitted multiple bills to GEICO for Fraudulent Equipment purportedly provided to an Insured on a single date in an attempt to conceal their scheme to fraudulently bill GEICO for Fraudulent Equipment purportedly provided to GEICO's Insureds by artificially lowering the amount of any one bill submitted to GEICO.

218.    Furthermore, within the bills, they knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring the DME Providers to obtain a Dealer in Products License from the DCWP.

219.    Defendants also knowingly misrepresented their billing by concealing that the prescriptions for Fraudulent Equipment were not based upon medical necessity but rather were based upon predetermined fraudulent protocols as a result of unlawful financial arrangements, were provided directly to the DME Providers without the involvement of Insureds, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

220.    Additionally, Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon predetermined protocols and without medical necessity in order to prevent GEICO from discovering that Fraudulent Equipment was billed to GEICO for financial gain.

221.    Finally, Defendants knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by the DME Providers to GEICO and included fraudulent invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

222.    The billing and supporting documentation submitted by the DME Providers, when viewed in isolation, did not reveal its fraudulent nature.

223.    GEICO attempted to verify the claims via examinations under oath for which the DME Providers failed to appear.

224.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

225.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through Defendants; or (ii) timely issued requests for verification with respect to all of the pending claims for No-Fault Benefits submitted through Defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

226.    However, Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file numerous individual, expensive,

and time-consuming collection proceedings, in piece-meal fashion against GEICO and other insurers.

227.    The Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme, since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

228.    The purpose of the mass filings of no-fault collection proceedings is to obtain adjudication on the fraudulent billing while obfuscating the fraudulent activity and further perpetuating the RICO enterprises. The Defendants use the monies collected from the No-Fault collection proceedings to continue perpetuating their fraudulent scheme.

229.    In fact, Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Defendants have been engaged in widespread fraud.

230.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within thirty (30) days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $525,000.00 based upon the fraudulent charges representing payments made by GEICO to Defendants.

231.    Based upon Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not

reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against BHDS Supply and Example Supply**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

232.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

233.    There is an actual case in controversy between GEICO and each of the DME Providers regarding more than $2.1 million in fraudulent billing that has been submitted to GEICO in the names of DME Providers and still remains pending.

234.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because Defendants did not comply with all local licensing laws as the DME Providers never obtained Dealer in Products licenses.

235.    The DME Providers also have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not due to medical necessity but – as a result of their participation in unlawful financial arrangements.

236.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich Defendants and others who are not presently known, rather than to treat the Insureds.

237.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because – to the extent the DME Providers provided any Fraudulent Equipment – the DME Providers fraudulently misrepresented that the charges for Non-Fee

Schedule items contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

238.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of BHDS Supply and Example Supply.

**SECOND CAUSE OF ACTION**
**Against the Paper Owner Defendants and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

239.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

240.    BHDS Supply and Example Supply together constitute an association-in-fact "enterprise" (the "DME Provider Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

241.    The members of the DME Provider Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, BHDS Supply and Example Supply are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other New York automobile insurers.

242.    The DME Provider Enterprise operated under ten separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one

business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Provider Enterprise acting singly or without the aid of each other.

243.    The DME Provider Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

244.    The Paper Owner Defendants and John Doe Defendant "1" have each been employed by and/or associated with the DME Provider Enterprise.

245.    Paper Owner Defendants and John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws, because: (i) in every claim, the DME Providers misrepresented that they had lawful Dealer in Products Licenses and were entitled to No-Fault Benefits when in fact none of the DME Providers were lawfully licensed as they never obtained Dealer in Products Licenses; (ii) in every claim, the DME Providers misrepresented that the

Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, the DME Providers misrepresented that the Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were forged and/or duplicated, provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (iv) in many claims, the DME Providers misrepresented the reimbursement rate for the Fraudulent Equipment billed to GEICO, to the extent that any Fraudulent Equipment was actually provided, when the billed for amounts grossly exceeded the maximum permissible reimbursement amount for the Non-Fee Schedule items purportedly provided to Insureds. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" – "2".

246.    The DME Providers Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the Paper Owner Defendants and John Doe Defendant "1" operated the DME Providers, inasmuch as the DME Providers never operated as a legitimate DME provider, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the DME Providers to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through the DME Providers to the present day.

247.    The DME Providers Enterprise is engaged in inherently unlawful acts inasmuch as it continues to both submit fraudulent billing to GEICO and to attempt collection on fraudulent billing

submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the DME Providers Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing.

248.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $525,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Providers Enterprise.

249.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against the Paper Owner Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

250.    GEICO repeats and realleges each and every allegation contained in this Complaint as if fully set forth at length herein.

251.    The DME Providers Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

252.    The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the DME Providers Enterprise.

253.    The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Providers Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the DME Providers were not eligible to receive under the No-Fault Laws because: (i) in every claim, the DME Providers misrepresented that they had lawful Dealer in Products Licenses and were entitled

to No-Fault Benefits when in fact none of the DME Providers were lawfully licensed as they never obtained Dealer in Products Licenses; (ii) in every claim, the DME Providers misrepresented that the Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, the DME Providers misrepresented that the Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were forged and/or duplicated, provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (iv) in many claims, the DME Providers misrepresented the reimbursement rate for the Fraudulent Equipment billed to GEICO, to the extent that any Fraudulent Equipment was actually provided, when the billed for amounts grossly exceeded the maximum permissible reimbursement amount for the Non-Fee Schedule items purportedly provided to Insureds. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1"– "2".

254. The Paper Owner Defendants and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

255. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $525,000.00 pursuant to the fraudulent bills submitted by Defendants through the DME Providers Enterprise.

256. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against BHDS Supply, Prasol, and John Doe Defendant "1"
### (Common Law Fraud")

257.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

258.    BHDS Supply, Prasol, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

259.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that BHDS Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact BHDS Supply was not lawfully licensed as it never obtained a Dealer in Products License; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

260.    BHDS Supply, Prasol, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce

GEICO to pay charges submitted through BHDS Supply that were not compensable under New York no-fault insurance laws.

261.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $145,000.00 pursuant to the fraudulent bills submitted by BHDS Supply, Prasol, and John Doe Defendant "1".

262.    The extensive fraudulent conduct of BHDS Supply, Prasol, and John Doe Defendant "1" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

263.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against BHDS Supply, Prasol, and John Doe Defendant "1"**
**(Unjust Enrichment)**

264.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

265.    As set forth above, BHDS Supply, Prasol, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

266.    When GEICO paid the bills and charges submitted by or on behalf of BHDS Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

267.    BHDS Supply, Prasol, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that BHDS Supply, Prasol, and John

Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

268.    BHDS Supply, Prasol, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

269.    By reason of the above, BHDS Supply, Prasol, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $145,000.00.

## SIXTH CAUSE OF ACTION
### Against Example Supply, Nesterov, and John Doe Defendant "1"
### (Common Law Fraud")

270.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

271.    Example Supply, Nesterov, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

272.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that Example Supply had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Example Supply was not lawfully licensed as it never obtained a Dealer in Products License; (ii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financially enrich those that participated in the scheme; (iii) in every claim, that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon

medical necessity; and (iv) in many claims, to the extent that any Fraudulent Equipment was actually provided, that the reimbursement rate for the Non-Fee Schedule items were less than or equal to the maximum permissible reimbursement amount when in fact these amounts were grossly inflated and well above the maximum permissible reimbursement amount.

273.    Example Supply, Nesterov, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Example Supply that were not compensable under New York no-fault insurance laws.

274.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $390,000.00 pursuant to the fraudulent bills submitted by Example Supply, Nesterov, and John Doe Defendant "1".

275.    The extensive fraudulent conduct of Example Supply, Nesterov, and John Doe Defendant "1" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

276.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Example Supply, Nesterov, and John Doe Defendant "1"**
**(Unjust Enrichment)**

277.    GEICO incorporates, as though fully set forth herein, each and every allegation in in the paragraphs set forth above.

278.    As set forth above, Example Supply, Nesterov, and John Doe Defendant "1" have

engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

279.    When GEICO paid the bills and charges submitted by or on behalf of Example Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

280.    Example Supply, Nesterov, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Example Supply, Nesterov, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

281.    Example Supply, Nesterov, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

282.    By reason of the above, Example Supply, Nesterov, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $390,000.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against BHDS Supply and Example Supply for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that BHDS Supply and Example Supply have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of action against the Paper Owner Defendants and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $525,000.00 together with treble damages, costs, and reasonable attorneys' fees

pursuant to 18 U.S.C. § 1964(c) plus interest;

   C. On the Third Cause of Action against the Paper Owner Defendants and the John Doe Defendants for compensatory damages in favor of GEICO in an amount to be determined at trial but more than $525,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

   D. On the Fourth Cause of Action against BHDS Supply, Prasol and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $145,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

   F. On the Fifth Cause of Action against BHDS Supply, Prasol and John Doe Defendant "1" for more than $145,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

   H. On the Sixth Cause of Action against Example Supply, Nesterov, and John Doe Defendant "1" for compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $390,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

   I. On the Seventh Cause of Action against Example Supply, Nesterov, and John Doe Defendant "1" for more than $390,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: May 1, 2025
  Uniondale, New York

        RIVKIN RADLER LLP

        By:___/s/ Barry I. Levy_____
          Barry I. Levy

Michael A. Sirignano
Michael Vanunu
Joanna Rosenblatt
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*